## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| GARY NASH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:17-CV-00562-C (BH) |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

By *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court is *Plaintiff's Brief on Appeal*, filed June 30, 2017 (doc. 15), and *Defendant's Brief*, filed July 28, 2017 (doc. 16).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

## I.  BACKGROUND[1]

### A.    Procedural History

Gary Nash (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act).  (doc. 15 at 4-5; R. at 164.)  On March 29, 2013, he filed his application for DIB, alleging disability beginning on March 19, 2013.  (R. at 164.)  His claim was denied initially on July 18, 2013, and upon reconsideration on October 25, 2013.  (R. at 185-88, 191-

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

93.) On December 3, 2013, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. at 194-95.)  He appeared and testified at a hearing on November 3, 2014.  (R. at 35-71.)  On April 23, 2015, the ALJ issued a decision finding him not disabled and denying his claim for benefits.  (R. at 9-34.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on June 19, 2015.  (R. at 5-8.)  The Appeals Council denied his request for review on December 28, 2016, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-4.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on November 10, 1961, and was 52 years old at the time of the hearing. (R. at 29, 41.)  He had at least a high school education and could speak English fluently.  (R. at 29.) He had past relevant work as a substance abuse counselor, residence supervisor, jailer, unit clerk, residence counselor, and director of classification and treatment.  (R. at 28.)

**2.    Medical Evidence**

On March 17, 2011, Plaintiff was treated at Parkland Hospital (Parkland) by Shiv K. Sharma, M.D., for chronic low back pain, which he described as a constant dull pain that radiated in his right hip and bilateral lower extremities to his feet.  (R. at 495.)  The pain was worse with activity, and only better with Hydrocodone.  (*Id.*)  He previously had surgery at L5-S1, and was told that no other surgery was needed.  (*Id.*)  A lumbar epidural steroid injection was attempted but he did not actually receive it.  (*Id.*)  He was not doing physical therapy but reported exercising daily on a bike, and later reported that he had not lost weight or exercised because of a hernia.  (*Id.*)  Plaintiff refused injection

2

therapy throughout his visit and only asked for Hydrocodone, on which he was very fixated, and he took more than prescribed. (R. at 495-96.) He was advised of the ill effects of taking more than prescribed, and it was agreed that he would be prescribed a lower dose for one month and then tapered off the medication. (R. at 496.) Dr. Sharma recommended physical therapy. (*Id*.)

On April 14, 2011, Plaintiff went to the Bluitt Flowers Health Center (BFHC), a clinic of Parkland, for a follow-up and a refill on his pain medication. (R. at 500.) He had disability papers with him and also complained of depression. (*Id*.) He had a supple neck with normal range of motion, normal heart rate with regular rhythm, and no edema in his extremities. (*Id*.) His dosage of Hydrocodone had been reduced to 60 pills. (*Id*.)

On December 12, 2011, Plaintiff was seen by Jean Jingzhi Bao, M.D., at Parkland. (R. at 455.) Dr. Bao noted that Plaintiff had been previously diagnosed with a non-reducible umbilical hernia two years earlier that was painful with pressure, but Plaintiff had no bowel obstructive symptoms. (*Id*.) He also had a history of lumbar spinal fusion, anterior approach, and continued to experience chronic back pain. (*Id*.) He reported that he had never smoked, did not use illicit drugs at that time, and drank about one ounce of alcohol per week. (*Id*.) He stated that he became short of breath after walking one block. (*Id*.) Dr. Bao recommended surgery to repair his umbilical hernia. (R. at 456.) On that same day, William W. Turner, M.D., noted that Plaintiff led a sedentary life with little activity due to the pain in his back and hips. (R. at 452.) His umbilical hernia surgery was scheduled for December 23, 2011. (R. at 454.)

On December 22, 2011, Plaintiff saw Dina Alhazim, M.D., for lower back pain that radiated down both legs. (R. at 449.) He reported that due to his bad back, he needed to take medication and could not move in the morning. (*Id*.) He also reported that his depression medication was not

3

working and requested anxiety medication.  (*Id*.)

On December 30, 2011, Plaintiff went to the Parkland day surgery unit for his umbilical hernia repair with Sarah C. Oltmann, M.D.  (R. at 530, 532-33.)  A CT scan demonstrated an umbilical hernia containing fat.  (R. at 533.)  The surgery went well, and Plaintiff was advised not to do any heavy lifting for 4-6 weeks.  (R. at 534.)

On January 3, 2012, Plaintiff had a post-operation follow-up, and his incision looked fine, had a good healing ridge, and some superficial epidermolysis.  (R. at 443.)  From a surgical standpoint, he would be unrestricted from activities in one month.  (*Id*.)

On May 11, 2012, Plaintiff reported that he was depressed and frustrated with his pain, and that he thought of suicide but had no intent or plan to commit suicide.  (R. at 440.)  He would go to Northstar for help with his depression.  (*Id*.)  He had normal mood, affect, and behavior.  (R. at 438.)  He was restarted on Gabapentin to help with nerve pain, and instructed to take Etodolac for inflamation.  (*Id*.)

On June 8, 2012, October 19, 2012, and January 17, 2013, Plaintiff went to ADAPT Institute of Texas (ADAPT) for mental health treatment.  (R. at 479-91.)  In his initial mental status exam on June 8, 2012, he appeared well-groomed, overweight, and blunted.  (R. at 490.)  He spoke clearly and denied delusions, but exhibited aggression as well as a suicidal plan to harm himself with a vehicle.  (*Id*.)  He exhibited a logical thought process, depressed mood, anhedonia, and cooperative behavior; he denied impairment; and he had average intelligence, fair insight, and fair judgment.  (*Id*.)  He consistently reported chronic back pain.  (R. at 484-88.)  At his last appointment, he reported feeling anxious but "emphasized that he [did] not have depression."  (R. at 481.)  He denied substance abuse; the doctor noted that Plaintiff had a series of arrests for domestic violence and

reportedly had another case pending for a felony.  (R. at 479, 481.)  Plaintiff gave contradicting information, and exhibited slurred, jumbled speech.  (R. at 479.)  He reported anger problems that could cause him to explode quickly, and he had been to anger management before.  (*Id*.)  He is primary problems were trying to stay away from illicit drugs and illegal behavior.  (R. at 481.)

On June 15, 2012, Beth Ann Ellsworth, P.T., created a physical therapy treatment plan for Plaintiff.  (R. at 424-25.)  Imaging showed he had a discectomy and fusion at L5-S1, degenerative facets at L4-L5, and hip degeneration.  (R. at 424.)  Plaintiff wanted to get tips on how to control his pain.  (R. at 424.)  His short term goal was to perform his exercise program at home on his own, and his long term goal was to return to work and daily activities without limitation.  (R. at 425.)  Plaintiff was discharged from physical therapy on August 29, 2012, because he was noncompliant with attendance.  (R. at 431-32.)

On June 22, 2012, Plaintiff was transported to Parkland by the Dallas County Jail.  (R. at 368-69.)  Mark Poynter, R.N., noted that he appeared to be under the influence of alcohol.  (R. at 368.)  He denied being hospitalized in the prior 30 days, stated he drank alcohol daily and used Xanax, and reported depression and low back pain.  (R. at 368.)  Plaintiff was observed to have no special needs, and Nurse Poynter referred him for chronic care and mental health treatment.  (R. at 369.)  He was treated at Parkland again on June 26, 2012, and complained of chronic back pain and depression.  (R. at 376.)  It was noted that he had a history of drug abuse with Xanax and Norco.  (R. at 377.)  He exhibited normal reflexes and gait, as well as grossly intact bilateral sensory and motor  functions.  (R. at 378.)  He refused a mental health referral and stated he would see a psychiatrist once he was released from jail.  (R. at 378.)

On July 1, 2012, Plaintiff saw Shabbir Saherwala, M.D. (R. at 387-91.) Dr. Saherwala noted

that Plaintiff was in jail for failure to maintain his lane and for forgery of a government document. (R. at 387.)  Plaintiff stated he was depressed and had been looking for a job but had not had one in three years.  (R. at 387.)  He also stated he had a lot of impulsive ideas.  (R. at 387.)  Dr. Saherwala ruled out diagnoses of mood disorder and benzodiazepam abuse.  (R. at 390.)

On October 20, 2012 and January 11, 2013, Plaintiff returned to BFHC complaining of back pain and seeking a refill of Hydrocodone.  (R. at 551, 555.)  In October, he refused any medication other than Hydrocodone and became upset when the doctor declined to refill his prescription.  (R. at 552.)  He requested a referral to a pain clinic for pain management.  (R. at 551.)  In January, he was advised that Norco was not the appropriate long term treatment for his lower back pain.  (R. at 555.)  An x-ray and MRI of his lower back showed degenerative changes.  (*Id*.)  He stated that nothing else improved his symptoms and bargained to receive 30 pills until his next visit.  (*Id*.)  He refused to try other medications or to get a physical exam, and stated that he wanted a new primary care physician.  (*Id*.)

On March 25, 2013, Plaintiff saw Cornelia W. Tan, M.D., at the Bluitt Flowers Geriatric clinic.  (R. at 559.)  He requested Hydrocodone, but Dr. Tan recommended non-narcotic medications.  (*Id*.)  He declined medications other than Hydrocodone.  (R. at 560.)  He declined a referral to a pain clinic and also refused to have an examination.  (R. at 559.)  Dr. Tan prescribed Trazodone, Risperidone, Etodolac, and a cane.  (*Id*.)

Plaintiff saw Lorraine Rudder, M.D., from April 17, 2013 to September 26, 2014.  (R. at 630-41, 643-48, 650-52, 654-57.)  In April, Plaintiff stated that his back pain had begun years ago when he fell off of bus steps and injured his back.  (R. at 639.)  He consistently reported that his back pain was constant, aching, chronic, and severe, and he was most symptomatic in the mornings and

evenings.  (R. at 630, 639, 643, 646, 650, 654.)  His pain decreased with rest and abated with medication.  (R. at 643, 646, 650, 654.)  Dr. Rudder routinely provided him with refills for Hydrocodone.  (R. at 632, 640, 644, 648, 652, 657.)

On May 31, 2013, Plaintiff underwent a consultive examination with Kelly Davis, M.D.  (R. at 561-64.)  His medical history included chronic low back pain, dyslipidemia, bipolar disorder, obesity, and substance abuse, and he took Hydrocodone and Trazodone.  (R. at 562-63.)  His back pain only improved with medication.  (R. at 563.)  He reported having one drink of alcohol and a few cigarettes weekly, but denied illegal drug use.  (R. at 562.)  Examination showed he was 68 inches tall and weighed 233 pounds.  (R. at 562.)  He was in no acute distress and walked with a single prong cane.  (R. at 562.)  Muscle strength measured 5/5 in the left and right shoulders, grip strength was 5/5 bilaterally, and muscle strength in his quadriceps, hamstrings, and calves measured 5/5 bilaterally.  (R. at 562.)  He could flex his shoulders 150 degrees and abduct his right shoulder 150 degrees and his left shoulder 130 degrees with no complaints.  (R. at 562.)  He was able to minimally squat while holding the table for support, but reported pain.  (R. at 563.)  He could not attempt to heel/toe walk, but could move about, and get off and on the table without assistance.  (*Id.*)  Although he had his cane, he could move around and walk without it.  (*Id.*)  An x-ray on his lumbar spine on June 3, 2013, revealed decreased disc space between L5-S1 with adjacent end plate sclerosis, and marginal osteophytes from L3 to L5.  (R. at 564.)  Degenerative changes in the lumbar spine were noted.  (R. at 564.)

On June 6, 2013, Plaintiff saw Leshea Jarmon, Ph. D., for a psychological consultive examination.  (R. at 565-70.)  He drove himself to the appointment.  (R. at 565.)  No difficulties were noted in his gait, but he did report using a cane sometimes due to arthritic pain in his lower

back. (*Id*.) He was cooperative, and rapport was easily established. (*Id*.) He reported that he was seeking disability due to mood instability associated with depression, bipolar disorder, and decline in his physical health. (*Id*.) He had battled several emotional problems and various levels of oscillating mood swings since 2006, and he was formally diagnosed with depression and bipolar disorder in 2012. (*Id*.) He began to experience mood instability after his common law wife passed away and also suffered suicidal thoughts, insomnia, and increased anger concerning his past and present life experiences. (R. at 565-66.) In addition to his mental health limitations, he also suffered lower back and hip pain associated with arthritis. (R. at 566.) His physical pain often impaired his ability to lift, bend, or stand, and hindered him from performing work-related duties. (*Id*.) He had a decrease in energy and an increase in sleep, irritability, and temper outbursts, as well as difficulty focusing and concentrating. (*Id*.) He was unemployed and uninsured, and relied on his family and odd jobs for support. (*Id*.) The mental status exam showed depressed mood and affect, fair memory, judgment, insight, and concentration, normal thought process and content, and no confusion. (R. at 568-69.) He was diagnosed with bipolar disorder and depressive disorder. (R. at 569.) He had a fair prognosis with continued support and management for his mental and physical health. (*Id*.) Dr. Jarmon opined that his declining physical health could limit his ability to work in high demand environments, but he could thrive in a structured, low impact work environment, provided he sought the necessary medical attention, psychotherapy, and psychiatric care. (*Id*.)

An MRI on June 7, 2013, showed severe narrowing of the L5-S1 space, grade 1 anterolisthesis at L4-L5, mild decreased disc space at multiple lumbar levels, facet arthropathy at L4-L5 and L5-S1 bilaterally, mild sacroiliac joint degenerative changes, and a vacuum phenomenon on the right. (R. at 597.)

### 3.    Hearing Testimony and Interrogatory Responses

On November 3, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 35-71.)  Plaintiff was represented by an attorney.  (R. at 35.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was 52 years old and had a college degree in rehabilitation studies.  (R. at 41.)  He had obtained his college degree about ten or twelve years ago.  (R. at 41.)  He had worked as a corrections officer for about ten years, and had also worked in warehousing.  (R. at 41-42.)  He was laid off in 2009.  (R. at 44.)  When he was a corrections officer, he worked with mentally handicapped juvenile individuals; he would have to subdue individuals and break up fights at times.  (R. at 42-43.)  He stated the alleged onset date was March 19, 2013, because he was still having problems with his back and depression, and had previously applied for benefits, and he had not worked since then.  (R. at 42.)

Plaintiff previously had fusion surgery on his back at L5, but his back began hurting again in 2009, when he was up "at night checking the doors," and his hip started bothering him to where he could not walk anymore.  (R. at 44.)  His back pain became worse when he was doing yard work one day and fell down.  (R. at 44.)  The pain was in his lower back and radiated down to his right hip.  (R. at 45.)  He was in pain daily and it stayed the same throughout the day, but could get worse if he was too active, or walking or standing too much.  (R. at 45.)  The hip pain came and went with his level of activity.  (R. at 45.)  He was in a pain management program with Dr. Rudder, who "basically supplie[d] [him] with medication."  (R. at 45.)  Walking was the only exercise he could do, and he tried to walk daily.  (R. at 45-46.)  He would walk a couple of neighborhood blocks, but no more due to his pain.  (R. at 46.)  It took him about an hour to walk two blocks.  (R. at 46.)  He

stated that he "pretty much" always used his cane when he was "out and about" due to his hip pain; his hip would lock up if he over-strained himself. (R. at 46.) He did not use the cane when he was in his house; he only needed it when he was walking. (R. at 47.) He could stand for about 10-20 minutes before he had to sit down due to his back aching and bothering him. (R. at 47-48.) It did not bother him to sit, but he could not sit for eight hours a day. (R. at 48.) He could probably sit for eight hours a day if he were able to get up and move around to stretch before sitting back down. (*Id.*) He then stated he did not know what he could do. (*Id.*) If offered another back surgery, he would not accept it because the first surgery did not help him as much as he thought it would. (R. at 49.) He previously had spinal injections but they did not work well. (R. at 57.)  He weighed about 245 pounds at the time of the hearing. (R. at 49-50.)

Plaintiff stated that he had trouble with depression, but he did not know if it was due in part to him not being sociable with others or his mom being very ill. (R. at 50.) His pain also exacerbated his depression because he could not do as much as when he was younger. (R. at 50-51.) He was not sleeping all the way through the night because he had "restroom problems" and pain. (R. at 51.) He would become irritable and cranky and did not get along with others. (R. at 51.) He worked with others when he was younger and thought he "probably could" work with others depending on the situation, but worked better on his own. (R. at 51-52.) He also had problems with his attention, attitude, and temper, and had trouble completing tasks. (R. at 53.)

He lived with his sister, and they got along well. (R. at 54.) He was only responsible for cleaning up his area and watching his mother, and he would not be able to do things like yard work or gardening if asked. (R. at 54-55.) Although he did not shop for the household, he believed he was capable of shopping for small items. (R. at 55.) The heaviest thing he could probably pick up

would be about 5-10 pounds, but he had probably picked up something that weighed over 10 pounds the morning of the hearing.  (R. at 55.)  Doctors told him he could not return to work as a correctional officer but did not restrict the amount of weight he could lift.  (R. at 56.)

### b.    VE's Testimony

The VE testified that Plaintiff had the following previous work experience: correctional officer, DOT 188.167-026 (SVP 7, sedentary), and residence counselor, DOT 045.107-038 (SVP 7, sedentary).  (R. at 58.)

The ALJ asked the VE to consider a hypothetical individual with the same age, education, and work history as Plaintiff who could perform light work as that term was defined in the regulations.  (R. at 59.)  He could lift and carry 20 pounds occasionally and 10 pounds frequently; sit/stand/walk 6 hours out of an 8-hour workday; never climb ladders, ropes, scaffolds, or crawl; occasionally perform other postural maneuvers; perform detailed but not complex tasks; and understand and carry out detailed, but not complex instructions.  (*Id.*)

The ALJ asked the VE if the hypothetical worker would be able to perform any of Plaintiff's past work with the stated limitations.  (R. at 59.)  The VE answered no.  (R. at 60.)  The ALJ then asked if the VE could provide three examples of jobs the hypothetical individual could perform.  (R. at 60.)  The VE responded that the hypothetical person could be a receptionist, DOT 237.367-038 (SVP 4, sedentary), with about 6,114 jobs in Texas, and about 100,573 jobs nationally; an order clerk, DOT 249.362-026 (SVP 4, light), with about 1,402 jobs in Texas, and about 19,320 jobs nationally; or a dispatcher, DOT 954.367-010 (SVP 4, light), with about 1,573 jobs in Texas, and about 17,007 jobs nationally.  (R. at 60-62.)[2]

---

[2] The VE initially stated the hypothetical individual could an work as a cashier, DOT 311.472-010 (SVP 2, light), with about 113,770 jobs in Texas, and about 1,148,438 nationally.  (R. at 60.)  Plaintiff's attorney stated that

The ALJ asked if the hypothetical individual would be able to use a cane while walking or standing. (R. at 62.) The VE responded that a cane is not ideal for a light job, but would be fine for a sedentary job. (*Id.*) If the hypothetical individual had to use a cane, the number of available jobs would be reduced by at least 80 percent. (*Id.*) The ALJ asked the VE to consider the same hypothetical, but the individual would only be able to sit, stand, and walk 4 hours in an 8-hour day, and had to use a cane while walking. (*Id.*) The VE responded that the jobs for the prior hypothetical would be fine, except that they might be reduced by 80 percent. (*Id.*)

The ALJ then asked the VE to consider the same hypothetical individual, reduced to sedentary work only, but the individual could lift and carry 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand/walk a combined 2 hours in an 8-hour workday; never climb ladders, ropes, scaffolds, or crawl; occasionally perform other postural maneuvers; perform detailed, but not complex tasks and instructions; and needed to use a cane while walking. (R. at 63-64.) The ALJ asked if that hypothetical individual could perform other work under those limitations. (R. at 64.) The VE responded that the individual could be an order clerk, DOT 249.362-026 (SVP 4, sedentary), with about 5,610 jobs in Texas, and about 77,264 jobs nationally; a dispatcher, DOT 221.367-070 (SVP 4, sedentary), with about 6,292 jobs in Texas, and about 68,030 jobs nationally; or an interviewer, DOT 205.362-018 (SVP 4, sedentary), with about 9,433 jobs in Texas, and about 101,284 jobs nationally. (*Id.*)

The ALJ asked the VE if the skills Plaintiff developed as a correctional officer and residence counselor would transfer to any of the jobs in the sedentary occupational base. (R. at 64.) The VE

---

because the SVP for the cashier was 2, that job would not fit the hypothetical, and the VE agreed and apologized for providing "the wrong one." (R. at 61.) The VE also initially provided the DOT for a sedentary dispatcher position. (R. at 61-62.) She then clarified that the job numbers were actually for the light level dispatcher position and proceeded to provide the correct DOT code for the light level, SVP 4 dispatcher position. (R. at 61-62.)

responded that Plaintiff's skills would be transferable to the job of interviewer, but not to a cashier or a dispatcher.  (R. at 64-65.)  The ALJ asked if Plaintiff had developed any skills that were transferrable to a semi-skilled occupational base.  (R. at 65.)  The VE responded yes, the skills would include management, supervisory, decision-making, writing, and planning skills. (*Id*.)  The ALJ then asked if the identified skills would transfer to jobs as an order clerk, dispatcher, or interviewer. (*Id*.)  The VE responded that they would transfer to a job as an interviewer, and would not directly transfer to the other jobs.  (*Id*.)

The ALJ asked if employment would be precluded if the hypothetical worker could not meet the exertional demands of sedentary work, either because he could not lift the required amounts or he could not sit/stand for the required length of time.  (R. at 65-66.)  The VE responded yes. (R. at 66.)  The ALJ asked if it would preclude employment if the individual was unable to work 8-hours a day, 40-hours a week, on a regular and consistent basis.  (*Id*.)  The VE responded yes.  (*Id*.)  The ALJ asked if it would preclude employment if the individual were off task more than 10 percent of the time or absent from the workplace two or more days a month.  (*Id*.)  The VE responded yes.  (R. at 66.)  The ALJ then asked if the VE's testimony was consistent with the DOT.  (*Id*.)  The VE responded that it was.  (*Id*.)

Plaintiff's attorney asked the VE if she could explain exactly what she meant by writing skills and decision-making skills, and how those skills fit in the definition of skills under Social Security Ruling 82-41, i.e., a skill includes activities such as making precise measurements, reading blueprints, and setting up and operating complex machinery.  (R. at 66.)  The VE responded that she looked at the skills and the GEO rating of each job.  (R. at 66-67.)  Plaintiff's attorney stated that the term "writing skills" was vague. (R. at 67.)  The VE responded that as a corrections officer, an

individual has to fill out forms, answer questions, write responses, and produce something others are going to read.  (R. at 67.)  Plaintiff's attorney then asked the VE how Plaintiff's writing of reports would qualify as a skill if according to the Social Security Ruling definition, it takes 30 days to learn a skill.  (R. at 67-68.)  The VE stated that Plaintiff had acquired skills from past work.  (R. at 68.)

The ALJ then asked the VE whether the DOT gave a list of transferrable skills for a particular job, or if she was using her experience to identify those skills.  (R. at 68.)  The VE responded that she used her experience, but she was also using a program called OASIS to pull up job titles in the DOT and determine what skills were needed to perform the job.  (R. at 68.)  It took more than 30 days to acquire the skills for a level 7 job.  (R. at 69.)

Plaintiff's attorney asked the VE whether the hypothetical individual could perform the jobs she identified or past relevant work if he was limited to SVP 2.  (R. at 69.)  The VE responded that the individual could not.  (R. at 69.)  Plaintiff's attorney then asked the VE if her reduction to 80 percent was based on the individual's use of a cane only, or if the reduction was due to standing and walking for 4 hours.  (R. at 69.)  The VE responded that the reduction was to allow for jobs where the individual could do his job from a seated position, either as an order clerk or dispatcher.  (R. at 69-70.)

### c.     VE's Interrogatory Responses

Plaintiff's attorney submitted a brief after the hearing in which he argued that Plaintiff's past work was not correctly identified at the hearing.  (R. at 336-43, 658.)  Based on the post-hearing brief, the ALJ submitted interrogatories to the VE.  (R. at 658-62.)  The VE provided written answers to the interrogatories.  (R. at 356-59.)

The interrogatories asked the VE to characterize Plaintiff's past work in vocational terms. (R. at 659.) The VE responded that Plaintiff's past work included the following: substance abuse counselor, DOT 045.107-058 (SVP 8, light); residence supervisor, DOT 187.167-186 (SVP 6, sedentary); jailer, DOT 372.367-014 (SVP 4, light); unit clerk, DOT 245.362-014 (SVP 3, light); residence counselor, DOT 045.107-038 (SVP 7, sedentary); and director classification and treatment, DOT 188.167-038 (SVP 7, sedentary). (R. at 357.)

The interrogatories asked the VE to explain why she identified those job titles for Plaintiff's past work, rather than the others that had been suggested by Plaintiff's attorney or by the VE in Plaintiff's prior case. (R. at 659.) The VE responded that she reached the job titles based on a review of a work history report and past notes in her file. (R. at 357-58.) The VE also noted the job titles presented by Plaintiff's attorney and explained why those job titles were not included as part of Plaintiff's past work. (R. at 357-58.)

The interrogatories asked the VE to consider a hypothetical individual that could lift and carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in a normal workday; stand/walk for 4 hours in a normal workday with normal rest breaks; occasionally climb ramps or stairs, balance, stoop, bend, kneel, and crouch, but never crawl or climb ladders, ropes or scaffolds; perform detailed but not complex tasks; and understand and carry out detailed but not complex instructions. (R. at 659.) The individual would also be required to use a cane while standing or walking. (*Id*.) The ALJ asked if this hypothetical individual would be able to perform any of Plaintiff's past work. (R. at 660.) The VE opined that based on the hypothetical, the individual would be able to perform the following jobs: residence supervisor, DOT 187.167-186 (SVP 6, sedentary); unit clerk, DOT 245.362-014 (SVP 3, light); and residence counselor, DOT 045.107-038

15

(SVP 7, sedentary).  (R. at 358.)

The interrogatories asked the VE to assume the hypothetical individual could lift and carry 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours in a normal workday; stand/walk for 2 hours in a normal workday with normal rest breaks; occasionally climb ramps or stairs, balance, stoop, bend, kneel, and crouch, but never crawl or climb ladders, ropes, or scaffolds; perform detailed but not complex tasks; and understand and carry out detailed but not complex instructions.  (R. at 660.)  The individual required the use of a cane while standing or walking.  (*Id.*)  In response to an interrogatory asking if the individual would be able to perform any of Plaintiff's past work, the VE responded that the hypothetical individual would be able to perform Plaintiff's past work as a residence supervisor, DOT 187.167-186 (SVP 6, sedentary); or a residence counselor, DOT 045.107-038 (SVP 7, sedentary).

The interrogatories asked the VE if Plaintiff would have developed transferrable skills in any of his past work that would transfer from light or medium level work to the sedentary occupational base.  (R. at 661.)  The VE responded that Plaintiff's transferrable skills consisted of: administering; advising-counseling; accommodating; protecting; verbal recording-record keeping; and numerical recording-record keeping.  (R. at 358.)  In response to an interrogatory asking if Plaintiff would have developed transferrable skills in his past work that would transfer from past sedentary level work to other jobs in the sedentary occupational base, (R. at 661), the VE responded yes, (R. at 358).

The interrogatories asked what the transferrable skills were and which jobs they would transfer to.  (R. at 661.)  The VE responded that the following jobs fall within the hypothetical: job development specialist, DOT 166.267-034 (SVP 5, sedentary), with 17,005 jobs in Texas and 200,182 jobs nationally; order clerk, DOT 245.367-026 (SVP 3, sedentary), with 5,610 jobs in Texas

and 77,773 jobs nationally; referral clerk, DOT 205.367-062 (SVP 3, sedentary), with 5,442 jobs

in Texas and 73,430 jobs nationally; and referral and information aid, DOT 237.367-042 (SVP 3,

sedentary), with 48,479 jobs in Texas and 610,358 jobs nationally.  (R. at 358-59.)  The VE stated

that her response was consistent with the DOT.  (R. at 359, 662.)

The interrogatories asked if the VE relied on her professional experience and training in

reaching her answers to the questions.  (R. at 662.)  The VE responded that she relied on her

professional experience and training in reaching her opinions, and relied on the use of the DOT and

other vocational sources to search jobs, transferrable skills, and numbers.  (R. at 359.)[3]

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on April 23, 2015.  (R. at 9-34.)  At step one,

the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 19, 2013,

the alleged onset date.  (R. at 15.)  At step two, the ALJ found that he had the following severe

impairments: obesity, degenerative disc disease of the lumbar spine status post lumbar fusion,

anxiety disorder, and personality disorder.  (R. at 15.)  Despite those impairments, at step three, the

ALJ found that Plaintiff had no impairments or combination of impairments that met or equaled the

severity of one of the impairments listed in the social security regulations.  (R. at 22.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: lift, carry,

push, and pull 20 pounds occasionally and 10 pounds frequently, with normal rest breaks; stand

and/or walk 4 hours out of an 8-hour workday; and sit 6 hours out of an 8-hour workday; no more

---

[3] Plaintiff's attorney objected to the interrogatories being entered into the record on grounds that they were unreliable as a whole and requested that the ALJ scrutinize the credibility and reliability of the VE's testimony and responses to the interrogatories.  (R. at 360-67.)  He also asserted that the VE's responses regarding Plaintiff's past relevant work were incorrect.  (R. at 360.)  The ALJ found that the responses were fully supported by the vocational evidence of record and entered them into the record.  (*See* R. at 29, 356-59.)

than occasionally climb ramps/stairs, balance, stoop, bend, squat, kneel, and crouch, but never crawl or climb ladders, ropes, or scaffolds; understand, remember, and carry out detailed but not complex tasks and instructions.  (R. at 25.)

At step four, the ALJ determined that Plaintiff was unable to perform any of his past relevant work.  (R. at 28.)  At step five, the ALJ relied on the VE's testimony and found that considering Plaintiff's age, education, work experience, and residual functional capacity, he was capable of performing work that existed in significant numbers in the national economy, including jobs such as receptionist, order clerk, and dispatcher.  (R. at 29-30.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from March 19, 2013, through April 23, 2015.  (R. at 30.)

## II.  ANALYSIS

### A.    Legal Standards

#### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

19

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff presents one issue for review:

The vocational expert's testimony and responses to the Administrative Law Judge's post-hearing interrogatories were not reliable and in conflict with the *Dictionary of*

*Occupational Titles.* The ALJ's reliance upon the vocational expert's testimony that there were other jobs the Plaintiff could perform with the limitations identified in the found residual functional capacity rendered the Unfavorable Decision in error of the law and not based upon substantial evidence.

**C.**   **Ability to Perform Work**

Plaintiff argues that the ALJ erred in finding that he could perform other work given his RFC. (doc. 15 at 9-10.)   He asserts that the VE's testimony was unreliable because it was in conflict with the Dictionary of Occupational Titles (DOT) and the Selected Characteristics of Occupations (SCO), and therefore could not serve as substantial evidence upon which the ALJ could base his RFC finding. (doc. 15 at 12, 16.)

To be considered disabled, a claimant must have a severe impairment that makes her unable to perform her previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [her] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. 20 C.F.R. § 404.1520(a)(4)(I); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

The Commissioner may consult several different sources of evidence, including vocational

experts and the DOT,[4] to determine when presumptively-disabled claimants can perform alternative and available work.  *See Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 608 (E.D. Tex. 2009). Vocational experts assess whether jobs exist for a person with the claimant's precise abilities and help determine complex issues, such as whether a claimant's work skills can be used in other work, and the specific occupations in which they can be used.  *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ may further rely on the testimony of a VE in response to a hypothetical question[5] or other similar evidence.  *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Bowling*, 36 F.3d at 435.

### 1.    Conflict with DOT

Plaintiff asserts that the ALJ erred by relying on the VE's testimony that he could perform two sedentary jobs, and in failing to explain the resolution of conflicts between the VE's testimony and the DOT and SCO.  (doc. 15 at 12-13, 16.)

SSR 00–4p establishes the ALJ's affirmative duty to bring to light and explain any "apparent unresolved conflict" between the VE's testimony and the DOT.[6]  SSR 00–4p, 2000 WL 1898704,

---

[4] The DOT and its supplement, the SCO, defined in the Revised Dictionary of Occupational Titles, comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs. The Commissioner recognizes the DOT/SCO publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy."  SSR 00–4p, 2000 WL 1898704, at *2.

[5] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, No. 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)).  A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

[6] Because conflict between VE testimony and the DOT occurred with some frequency, the Commissioner issued SSR 00–4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony.  SSR 00–4p, 2000 WL 1898704 (S.S.A. 2000).  SSRs represent "statements of policy and interpretations" adopted by the Social Security Administration that are "binding on all components" of the Administration.  20 C.F.R. § 402.35(b)(1).  While binding on the Administration, these interpretive rulings are not binding on the courts, so courts need not give them the force and effect of law.  *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (noting the varying degrees of deference the rulings may be afforded); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam).  However, courts may "rel[y] upon the rulings in evaluating ALJs' decisions."  *Myers*, 238 F.3d at 620.

at *2 (S.S.A. 2000).  As part of his duty to fully develop the record at the hearing level, the ALJ must inquire on the record whether or not there is such an inconsistency.  *Id*. at *4.  The ALJ must also explain in the decision how any conflict was resolved.  *Id*.  Neither the DOT nor VE testimony automatically trumps when there is a conflict.  *Id*. at *2; *Siller v. Barnhart*, No. SA–04–CA–0514 FBNN, 2005 WL 1430361, at *7–8 (W.D. Tex. June 17, 2005) (finding that neither the DOT nor VE testimony should automatically be accorded controlling weight).  Occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT, however.  SSR 00–4p, 2000 WL 1898704, at *2.  A claimant is not required to raise the issue of any discrepancy at the hearing.  *Romine v. Barnhart*, 454 F. Supp. 2d 623, 627–28 (E.D. Tex. 2006) (citing *Prochaska v. Barnhart*, 454 F.3d 731, 735–36 (7th Cir. 2006)).

A direct conflict may arise when the VE's testimony regarding the exertional or skill level of a particular job is facially different than that indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT.  *See Carey*, 230 F.3d at 145.  Conversely, implied conflicts and exceptions occur under various unique circumstances when VEs are called to testify as to an individual claimant's capabilities.  *See id*. at 146–47.  Because the DOT cannot satisfactorily address every such situation, claimants are not permitted to scan the record for implied or unexplained conflicts and then present the conflict as reversible error.  *See id*.

The ALJ relied solely on the VE's testimony to determine that an individual with Plaintiff's RFC could perform other work as a receptionist, order clerk, and dispatcher.  (R. at 29-30.)  The VE identified receptionist, order clerk, and dispatcher as jobs for an individual who could perform light work.  (R. at 60-62.)  She identified receptionist as a sedentary position and order clerk as "light,

23

level 4" position.  (R. at 60-61.)  The ALJ asked the VE if her testimony was "consistent with the [DOT]," and the VE responded that it was.  (R. at 66.)

In the DOT, 249.362-06 Order Clerk, is described as:

*STRENGTH: Sedentary Work -* Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work invoves [sic] sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occsasionally [sic] and all other sedentary criteria are met.

*See* Dep't of Labor, D.O.T. 249.362-026, 1991 WL 672320 (G.P.O.1991) (emphasis added).  The VE's testimony that the position was light, rather than sedentary work, appears to be in direct conflict with the DOT.  The Fifth Circuit has recognized, however, that "a finding that an individual can perform light work also constitutes a finding that the individual can perform the lesser included category of sedentary work, unless there are additional limiting factors . . . ."  *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).

Plaintiff argues that the ALJ could not rely on the VE's testimony as to the sedentary jobs because the Medical Vocational Guidelines direct a finding of disabled if the only jobs available to him were at a sedentary base.  (doc. 15 at 13.)  The Commissioner concedes that the ALJ erred by considering the two sedentary jobs provided by the VE when Plaintiff's RFC was for a limited range of light work because under 20 C.F.R. Part 404, Subpart P, Appendix 2, §201.14, an individual with Plaintiff's age, work experience, and education  is disabled if limited to only sedentary work.  (doc. 16 at 5.)  Although light work generally encompasses sedentary work, a conflict exists because Plaintiff would be found disabled if he were limited to sedentary work.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, §201.14.  The ALJ had an obligation under SSR 00-4p to resolve this

24

conflict but did not.  (*See* R. at 28-30.)  Accordingly, the ALJ erred by failing to resolve the conflict in the VE's testimony, and by considering two sedentary jobs, when limiting Plaintiff to sedentary work would require a finding of disabled.

### 2.    Reliability of VE's Testimony

Plaintiff next asserts that the VE's testimony that he could work as a dispatcher was unreliable because the VE provided DOT codes for two different dispatcher jobs in response to the second hypothetical, and because she identified dispatcher as a job an individual with Plaintiff's RFC could perform without explaining how he could perform substantially all of the activities of light work.  (doc. 15 at 13-16.)

The hearing transcript shows that the VE accidentally provided the wrong DOT number for the dispatcher job initially, and then corrected herself by providing the correct DOT code for a dispatcher at the "light, semi-skilled" level.  (*See* R. at 61-62.)  This does not make her testimony unreliable.  Additionally, the ALJ utilized the corrected DOT code in his decision that Plaintiff could perform work as a dispatcher.  (R. at 30.)

As for the VE's testimony about Plaintiff's ability to perform the dispatcher job, as noted, the ALJ could rely on the testimony of a VE to make this determination.  *See Carey*, 230 F.3d at 145; *Newton*, 209 F.3d at 458.  A VE relies on the DOT in order to testify regarding skills needed and availability of specific jobs.  However, the DOT "is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job." *Carey*, 230 F.3d at 145.  "[A]ll kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation ." *Id*. at 146. Therefore, the VE must interpret the DOT and make adjustments to fit a particular claimant.

Accordingly, the ALJ must rely upon the VE to make adjustments to the availability of jobs based on a particular claimant's skills and abilities. The ALJ determined that Plaintiff could perform work as a dispatcher at the light exertional level and considered the limitations imposed upon Plaintiff. (R. at 29-30.)

Essentially, Plaintiff argues that he cannot perform light work because he is limited to standing and walking for 4 hours in an 8-hour workday. (doc. 15 at 15.) This argument disregards the VE's interpretation of the DOT, however. At the administrative hearing, the ALJ's second hypothetical incorporated the limitation of standing and walking for 4 hours in an 8-hour workday. (R. at 62.) The VE considered this restriction and determined that Plaintiff could perform the light level job of dispatcher, but that job would be reduced by 80 percent to allow for jobs where the individual would be able to do their job from a seated or standing position. (R. at 61-63, 69-70.) It is clear from the transcript that the VE considered this limitation in determining that Plaintiff could work as a dispatcher.

The ALJ did not err by relying on the VE's testimony that Plaintiff could work as a dispatcher.[7]

### 3.    Harmless Error

As discussed, the ALJ did err in relying on the VE's testimony that Plaintiff could perform two sedentary jobs when his RFC was for light work because under the guidelines, a finding that he could perform only sedentary work would result in a finding of disabled. Accordingly, there is a lack of substantial evidence to support the ALJ's finding that Plaintiff could perform the three jobs

---

[7] Plaintiff also argues that the VE's interrogatory responses were unreliable because she identified sedentary skilled positions in response to a hypothetical of an individual limited to semi-skilled light work. (doc. 15 at 14-15.) The ALJ's decision shows that he did not rely on the interrogatory responses in determining that Plaintiff could perform other work, however. (R. at 29-30.) The reliability of those responses is therefore not at issue.

identified by the VE. *Greenspan*, 38 F.3d at 236.

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the VE's testimony was "actually inconsistent with the DOT" and could have resulted in a different decision. *See Graves*, 837 F.3d at 593 (applying a harmless-error standard when the ALJ erred by failing to ask the VE if her testimony was consistent with the DOT.)

Here, the ALJ considered the jobs of receptionist, order clerk, and dispatcher in determining that there were a significant number of jobs in the national economy. (R. at 30.) As discussed, there was a lack of substantial evidence to determine that Plaintiff could work as a receptionist or order clerk. Plaintiff was prejudiced when the ALJ included those jobs in his determination that there were a substantial number of jobs available to Plaintiff because excluding them might have led to a different decision. Although the Commissioner contends that the amount of dispatcher jobs alone may constitute a significant number of jobs, the ALJ's consideration of that job on its own may also have resulted in a determination that there were not a significant number of jobs Plaintiff could perform. (*See* doc. 16 at 6.) Moreover, it is unclear if the reduction to 80 percent of available jobs was due to the use of a cane or the limitation of standing/walking for 4 hours in an 8-hour workday.

The requirement for establishing prejudice has been satisfied because it is possible that consideration of the dispatcher job on its own would have caused the ALJ to make a different determination regarding Plaintiff's ability to make a successful adjustment to other work that exists in significant numbers in the national economy. The ultimate determination, however, will be made on remand. Accordingly, Plaintiff has demonstrated that he was prejudiced and that a substantial right has been affected. The error is therefore not harmless, and remand is warranted.

### III.    RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED**, on this 3rd day of April, 2018.

_Irma Carillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_Irma Carillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE